Good morning, Your Honors. May it please the Court. John Hacker for the appellants. As the recent decisions in Komatsu and Onyx explain, bump-up clause in a liability policy for directors and officers exists to ensure that insurance proceeds do not become an additional source of funding for inadequately priced corporate deals. To avoid that outcome, the clause here addresses lawsuits alleging that, quote, the price or substantially all the ownership interest in or assets of an entity is inadequate. Under the clause, when a lawsuit makes such an allegation, the policy will cover the defense, but it will not cover, quote, any amount of the judgment or settlement representing the amount by which such price or consideration is effectively increased. The District Court here rejected application of that plain language because in the Court's view, an acquisition under the clause refers narrowly only to transactions where both parties survive and excludes mergers where one party no longer survives, which in the Court's view is what happened here. That's wrong, Your Honors, for basically two reasons. First, nothing in the bump-up clause is dependent on the survival of either entity. If one entity merges with another into another and just disappears, the eliminated entity, of course, was acquired by any understanding of that term, as that example shows. There's no merit to the District Court's focus on acquisition as a narrow term of art requiring that a party survive. Second, Towers-Watson, in any event, did survive the transaction that was relevant here, which is the transaction that was challenged in the underlying suits, for both reasons. While one can accurately describe the transaction here as resulting in a merger, it was a merger executed as an acquisition, which in turn triggered a lawsuit by Towers-Watson shareholders complaining that they were forced to relinquish their shares for inadequate consideration. Put slightly differently, Your Honors, we know that the ownership interest in Towers-Watson was acquired because shareholders complained about the inadequate consideration they received when they were forced to relinquish that ownership. Let me start with the controlling documents in the transaction, which both control what the relevant transaction is and help explain why there's an acquisition of the ownership  property. We know it's structured as a reverse-triangular merger, and all authorities, from this Court and elsewhere, recognize a reverse-triangular merger as an acquisition. The proxy statement and associated documents are completely explicit about this. They say that Willis was the acquiring entity, that's a JA-536, that Towers-Watson would be surviving as a subsidiary of Willis, that's a JA-496 and 501. So now a reverse-triangular merger exists when the acquiring subsidiary merges into the acquired entity and leaves the target existing. It's different from a forward merger, where the acquired entity just merges into and disappears. In this case, the subsidiary, in any reverse-triangular merger, the subsidiary of Willis has created Citadel. It merges into Towers-Watson, and by so doing, sort of pulls Towers-Watson into and under Willis, leaving Towers-Watson as the surviving subsidiary. That's the relevant transaction. The District Court and Towers-Watson incorrectly focus on the second part of the overall deal, which is an internal reorganization, which wasn't relevant to the shareholder lawsuits that are at issue. Can I ask you a technical question that, just to, I'll preface my question with, I don't think this necessarily matters for the outcome, for the heart of your case, but I want to make sure I'm understanding these transactions correctly. Is it, is it correct to say that when Willis acquires the ownership interest in Towers-Watson, because we have the reverse-triangular merger, Towers-Watson becomes a subsidiary, Willis, per the transaction documents, then holds all the outstanding shares of Towers-Watson. The assets of Towers-Watson are still owned by Towers-Watson. They're not owned by, they're not acquired, the assets are not acquired by Willis at that point. The assets are acquired by Willis later when Towers-Watson merges into a different Willis subsidiary. So that's, that's absolutely correct with one addition, caveat. It's not correct to some extent, how is it not correct? What a qualified stock purchase is, what that is, is entitles the taxpayer to treat what would be a stock transfer, which, a stock exchange, a stock purchase, as an asset purchase for a taxpayer. Yes, okay. It's actually sort of, it's a matter of law, it's both, it's a matter of tax law, it's both. Now they say they didn't make that election, and that's fine. The ownership interest allows you to treat it as though you own those assets. For tax purposes. For tax purposes. For tax purposes, right. And they say they didn't make that election, that's not, it's completely irrelevant that they didn't make the election. But after the second part of the transaction, where Towers-Watson merged into another subsidiary and kind of ceased to exist, its assets were then, you know, in all senses, owned by, acquired by the Willis entity. Right, which is one of the errors in, the court makes in focusing on the fact that Towers-Watson is eliminated in the second phase of the transaction, the internal reorganization. As I say, first of all, survival is just irrelevant under the plain text of the bump up clause. But also, even if you think that somehow matters, at the end of the day, Towers-Watson owned all of its own assets on, you know, day one, and on day two, or day three or four, after the whole deal is complete, Towers-Watson doesn't own any of the assets anymore. A new entity, Willis, owns them. And because of the internal consolidation, which you're going to hear a lot about, the former Towers-Watson shareholders are, you know, 49.9% shareholders of this new entity. But the assets are now owned by Willis. There's a sale of substantially all, of all or substantially all of the assets, if you look at the transactions together. And we submit, of course, the first error is even looking at that second transaction because the second transaction, your honors, wasn't relevant to the shareholder lawsuits that triggered coverage under, as a securities claim, under the provision, under the policy. The policy is here, we're only talking about coverage because shareholders said, in this transaction, no matter how you look at it, in this transaction, our shares were relinquished for inadequate consideration. Somebody else acquired the shares. Who was this somebody? It was Willis. And they acquired all the shares. And the shareholders said they didn't get adequate consideration. The plain language of the bump-up clause says, in those circumstances, the policy will pay for the defense, absolutely, and we did pay for the defense. But we won't pay for that portion of any judgment or settlement of that claim for inadequate consideration that represents effective increase in the consideration. I'm sorry, go ahead. Mr. Hacker, but isn't Ms. Cohen going to get up and say, that's not what happened? There wasn't an effective increase, and that's not the basis for our claim. If, in fact, she gets up and says that, my fundamental problem is, it sounds like we disagree on the facts. And if we do, how is summary judgment appropriate? Well, so, first of all, we think you can reach it as a matter of law. They moved for summary judgment on that. I agree with that. I understand, but didn't, isn't this brought to us as a result of a cross-motion for summary judgment, where both parties said, there are no disputed facts. We believe this should be decided as a matter of law. And then I'm left with trying to figure out which one of you I believe. I think, functionally, that's where we are, just to be clear about the procedure. What we said in response to their summary judgment, we did not file a, something denoted a cross-motion for summary judgment, at least, it's not my understanding. What we said in response was under Rule 56-F, because the facts are clear, you can grant a motion independent of the, a judgment independent of the motion. Sure. So you're going to now tell me. No, let me try to explain to you why I think it can be resolved as a matter of law. To the extent you think there are facts in dispute, we agree that a remand would be required. That is, you know, that would be acceptable because we think we'll just show very easily to the district court what I'm about to explain to you, which is that the settlements unambiguously represented an effective increase in the consideration for multiple reasons. Start with the settlements themselves, what they say. The settlements themselves provide consideration, the money that's paid, the $15 million for the Delaware action and the $75 million for the Virginia action, when they're explained to the judgment in the fairness documents, excuse me, explained to the court in the fairness documents, they're prorated by shares. They're pegged to shares and the amount of shares that each shareholder has. And in the Onyx case, the court emphasized that as a way of identifying that whatever else may be true, and there's other things I'm going to talk about, but whatever else may be true, when the payment says this is how much on a per share basis each of you is getting, that is on its face an effective increase in the consideration, the per share consideration they got. The settlements themselves, and they wouldn't be required to, don't say the exchange price was X, you should have gotten X plus Y, the difference is Z, that's what you're going to get on a per share basis. Precisely because the first part of your question, which is they wouldn't be required to, they That's also why the bump up clause says it has to represent an effective increase in consideration. You just have to look at the facts and identify whether or not what they got was an effective increase in the consideration. But isn't that what we have to figure out is whether or not it was in fact an effective increase and how do we get there? So the first place is by just reading the settlements, I think. That's what the Onyx court said, which I believe is on summary judgment. Settlements tell you that this is per share, this is the amount you got before, you're getting more now on a per share basis. That's one fact. The other fact is what the complaints were seeking, which was entirely inadequate consideration. Don't you disagree on that point as well? I don't think so. I mean, they may say that they disagree, but you can read the complaints, you can't disagree with what the complaints say. What the complaints allege and seek is additional compensation. In the record, doesn't the trial judge ask the parties to submit their positions relative to the effect of the settlement and what you believe the damages or the inadequacies are? And the parties don't issue a joint document in that regard, do they? And in fact, you submit separate documents arguing in different directions. Right, but in any summary judgment, that's true, right? Parties argue different things and they will sometimes insist that they have different views of the facts, but the facts are what they are. And the facts here are what the settlements say, what the complaints allege, which is that we did not get paid enough. That's why they're complaining. What the expert report says, that's what you're going to hear from Ms. Cohen, I'm sure. That the expert report, the experts didn't allege a theory of that they should have received increased compensation. That's just not true. When you read the expert reports, particularly on the Virginia case, the only one that's even relevant here, they didn't make this argument with respect to Delaware. With respect to the Virginia, the Virginia expert absolutely does a theory of underpayment for stock. What she points to, what she's talking about is a, and this is what the district court described, I think in a footnote, or early in the opinion, what the district court says is part of one of the theories, several different damages theories, one of the theories that Towers Watson points to is a change in stock value, right, before the Towers Watson, before the deal was announced, Towers Watson stock was at X, the deal gets announced, it goes down to X minus 10, he says, and he says if the conflict had been disclosed, it would have jumped back up to X, so that 10 delta is a difference in stock value, and they say that's not a claim for inadequate consideration. That's not true. The expert says to the contrary, if you look at page 348 of the joint appendix, when he's explaining the theory, he says this is just another way of explaining, of showing the compensation they should have received, when their stock went from X to minus 10, the minus 10 delta, that's the amount that they should have been compensated in Willis stock, that's another way of getting at the amount they should have been compensated, he explicitly says this is their out-of-pocket loss, and out-of-pocket loss is another way of saying I didn't get compensation, if I gave up my stock for an insufficient amount and lost, you know, that minus 10, or whatever other ways there are of getting it, none of those facts, your honor, are disputed. So that's why I think you could resolve this as a matter of law at this stage. I accept that if you think, you know, these arguments should be heard in the first instance by the district court, I understand that, one could say that. The one thing you cannot do, I think, on the facts I've just discussed, is affirm judgment for Towers-Watson on the theory that as they argue as a matter of law, this is their argument as a matter of law, this is not an increase, an effective increase in consideration, and there is absolutely no way to get to that result, your honors. If there are no further questions on that, or the other issue, or the primary issue, I'm happy to see that. I have one inquiry which probably does not go to the merits, but just so I'm sure. So when Citadel merged into Towers-Watson, what was the status of the stock ownership of Towers-Watson at that point? I'm not going to understand, what do you mean the status of the ownership? Who owned the stock of Thomas? The same shareholders would have owned it. So the pre-merger Towers-Watson stockholders were unchanged when Citadel merged into Towers-Watson? I'm only hesitating because, you know, the precise timing, there was part of the transaction there was a merger into, but part of the transaction that included, right, the exchange, Towers-Watson shareholders gave up each of their shares for a certain amount of Willis shares. I think that happened after, I'm virtually certain that happened after, it may have been now, after the merger into, and then, and then, so what happens is there's a merger that pulls Towers-Watson that becomes a subsidiary, wholly owned subsidiary of Towers-Watson, of Willis, and then, or also, the shares are exchanged. So they're sequential steps, even if they're only momentary, but they are sequential. I don't want to swear to you that they're sequential in that way, but what does happen, of course, is that you end up with both the stock exchange and then the reverse stock split, which consolidates shares, so that you end up with the 49.9% and 50.1% shared ownership. All right, thank you. You've got some rebuttal time. I do note that when the case arose for interpretation of an insurance contract, we lost our audience. So with that, we'll hear from you, Ms. Cohen. I'm sure it wasn't the insurance aspects, it was the corporate law aspects. Good morning, Your Honors. May it please the Court, I'm Robin Cohen on behalf of Willis Towers-Watson. The District Court got it correct when it found that these insurance companies did not meet their high burden in establishing that the stop-for-stock merger constituted unequivocally and clearly an acquisition as that term is used in the policy. Fundamental problem with the carrier's analysis is they are looking at it as an esoteric corporate issue, as opposed to looking at it by the fact that this is exclusionary language in the policy, and they must demonstrate that this transaction clearly and unequivocally was an acquisition as used in the policy, and that our interpretation is not equally possible. Unlike the cases that Mr. Hacker mentioned, like the Onyx case and the Ceradyne case, those were cash buyout deals. Here, it is undisputed, as shown in the proxy statement, you had two companies of relatively equal size, merged and combined into a new company, and unlike those cases, Towers-Watson didn't walk away with cash. They became co-owners of a new business with virtually equal ownership and equal control. In fact, the board of the new company consisted of six former Tower-Watson directors and six former Willis directors. Why does that make a difference? Because you're looking at it from the perspective of an ordinary person and how they would view the transaction. If everything is equal, equal ownership, equal control, the fact that the Tower... It wasn't, I mean, there were, as I understand the record, the Willis stockholders ended up with a majority. Well, Your Honor, to your question, they did, 50.1%. And we would suggest that 51%, 50.1% of the new business does not constitute all or substantially all of the ownership interest in or assets of. Can I ask you about that? After the transaction, who possessed all of the outstanding shares of Towers-Watson? There was no longer any shares, and this goes to Judge Agee's question. So you're, that's key. So you're thinking, when I say after the transaction, you're thinking kind of both steps. Yes. So after the transaction then, who possessed all the assets of Towers-Watson? Towers-Watson disappeared. Right, but its assets didn't, right? They didn't evaporate. They weren't nuked. Where did their assets go? Who owned them? Who possessed them after the transaction? The Willis subsidiary. Because what happened, and this is to... So Willis. Not Willis, the Willis subsidiary. So what happened here is that, and I think this is how... So the Willis subsidiary has all of the assets of Towers-Watson. It had to get to them somehow. And another word for get is acquire. It had to acquire them. So Willis never acquired any of the stock and any of the assets. The proxy statement is very clear. With respect to the stock, the Towers-Watson stock was canceled and delisted. And the Tower-Watson shareholders received by operation of law the newly issued Willis shares. So Willis never bought any of... I thought there was a... I thought that transaction document said that the surviving entity, which was Towers-Watson... Yes, it was delisted. And then it had to issue new shares, which were all held by Willis. Yes, but the shares that were owned by the Tower-Watson shareholders were delisted and canceled. That's JA-510 and JA-536. So Willis never acquired any of the Tower-Watson shares that Towers-Watson shareholders owned. You are correct, Your Honor, at JA-758. At a certain point, Towers-Watson issued new shares that the Tower-Watson shareholders never owned. And those shares almost immediately went into the Willis subsidiary. Who owns the Willis subsidiary? WTW. It was Willis and they did a name change to Willis-Towers-Watson. And so Willis-Towers-Watson, Your Honor, owns the Willis subsidiary that is WTW-Delaware Holdings. But for purposes of this policy, as the District Court found and is supported by... So at least through the subsidiary, this parent corporation does own all of the prior assets of Towers-Watson. Well, Your Honor, Towers-Watson, when it merged into Citadel, and then it disappeared that day into the subsidiary, so the subsidiary, to the extent Towers-Watson still exists, would be in the subsidiary. It's not in WTW, which is the parent. Right. But the parent owns the sub and the sub owns all of the assets that previously were in Towers-Watson. Yes. Yes. So how does that affect this case? Because you have to show that Towers... I'm sorry, that Willis actually bought the assets. They have to buy all or substantially all of the assets. That's not the term of the policy. I'm sorry, Your Honor? Acquired. Acquired. It's acquire all or substantially all of the assets. And the question of what does acquire mean? So if the parent owns the sub and the sub owns all the assets, hasn't the parent acquired, even though it's not directly, all the assets of Towers-Watson? No, Your Honor, because Willis never bought any of the assets. As the district court found, it was a stock-for-stock merger. But at the end of the day, they still control them all. So I'm having difficulty understanding the value of the distinction you want to draw. Okay. So the difference is what would an ordinary, reasonable person think when they see the words acquire all or substantially all? No one disputes that at most, Willis acquired 50.1% of the stock. That clearly, or I think reasonably, would not be all or substantially all of the stock. With respect to the assets, that language, all or substantially all, comes right out of the Delaware Code, and that is an asset sale. And even the defendants would concede that this is not an asset sale. So whether you look at the fact that Willis never bought the stock, or this is not an asset sale, our position we submit would be reasonable based upon an ordinary person. Well, why wouldn't that reasonable, ordinary person look at this and see that even though it goes in a corporate train, that the parent corporation can do whatever it wants to with all of these assets? It just seems like to me it would be hard for this hypothetical, ordinary person not to see that transaction as an acquisition of all the assets. Because, Your Honor, what we believe an ordinary person would look at is you have two companies of relatively equal size. They merge into a new company. The tower wants and shareholders don't walk away with cash as they did in the other cases. They become equal owners and have equal control of the new business. It's difficult to envision a situation that is more like a merger than this particular situation. You would have to, and especially given the language in the policy that talks about all or substantially all, they can't get away from the fact that the new company, the Willis only had 50.1% of the stock. Under any reasonable way of looking at that, that's not all or substantially all. With respect to the assets, that's a term of art under Delaware law. This was not an asset sale. It was exactly the opposite of an asset sale. It seems, I had this impression reading the briefs as well, it seems like you kind of have to choose if you're going to say a reasonable, ordinary person who doesn't know much about corporate law principles and doesn't read the deal documents, they would look at this and say, yeah, it looks like two equals merged. You kind of have to choose if that's your theory or if your theory is this is a highly specialized term of art where acquisition of all or substantially all of the assets is understood to mean an asset purchase that necessarily excludes mergers as defined in Delaware law. Rushing, let me address that point because let me start with the ordinary reasonable person. They're going to look at the policy and then they're going to look at the proxy statement, which they say is the controlling document. That proxy statement describes this transaction as a merger over 1,600 times. The only time the word acquirer is mentioned at all is in the context of the accounting treatment. Even in that technical accounting treatment, it says in the proxy statement that although we are a merger of equals, for purposes of accounting treatment, we have to choose an acquirer and an acquiree. So a reasonable ordinary person looking at the documents would say it screams we are a merger. Even in the tax treatment, it expressly says although we are a merger, we have to do this for technical reasons. That argument assumes that acquisition of all or substantially all the assets or ownership interests excludes all mergers, which it just doesn't as a matter of corporate law, right? Well, Your Honor, the mergers and acquisitions are distinguished under the policies. And a reasonable ordinary person would look at the policy and look at these documents, including the proxy statement, the merger agreement, and the SEC filings, and come to the conclusion that this was the reverse of a merger.  This was a merger. The language all or substantially all, as a Northrop judge found, that's a takeover. It's a difficult proposition to suggest when the Tower Watson shareholders had equal control and equal ownership and didn't walk away with cash but became part of the business. That's a takeover. So why would an insurance company write an exclusion provision like we have here to carry the meaning that you offer? It doesn't seem to make any sense to me that that, I mean, obviously if they wrote it, that's to be construed in the insurer's favor and all that sort of stuff. But it just doesn't make sense to me that the exclusion would have been written to have that impact. Your Honor, we would disagree for this reason. The policy is designed to cover alleged wrongful conduct in a securities situation. This sort of case where there's lawsuits after a merger is very common. And so the grant of coverage is very, very broad. So if you want to take away that coverage, you have to do it clearly and unambiguously. And what the district court found, that in this case, they did it very narrowly. They said, if you are this particular type of transaction, which is a takeover, then we are potentially going to take away that coverage. So when we submit, Your Honor, it's very consistent with the policy. We also disagree with counsel. If the purpose of the exclusion, which there is nothing in the record to suggest this, but if the purpose is to make sure the policyholder, which is Towers Watson, make sure they don't fill in the gap and use the coverage because they bought something that was too cheap, that doesn't serve the purpose here. Because Towers Watson isn't being alleged to have bought Willis cheaply. It's the other way around. It is Willis that is being accused of buying Towers Watson cheaply. So even if we were to go and... The other way of saying that is that Towers Watson sold out too cheap. But that was not what counsel was suggesting was the purpose of it. They were suggesting that it was a situation where a policyholder was attempting to buy something too cheaply and using the coverage. It doesn't serve that purpose. The other thing I would note, Your Honor, is the cases that they cite to, like Onyx, and Ceradyne, and Komatsu. All of those cases underscored why we're correct. In all of those cases, the court made it clear that our situation, which was a merger, is different than their situation that were clear acquisitions where the comparable Tower Watson shareholders walked away with cash. If I may address the increase in consideration argument at this point. You are correct, Judge Dawson. Both sides filed motions for summary judgment on the issue. It is undisputed that when you look at the issue of whether this was a loss that the loss represents an increase in consideration, you have to look at the assumed liability at the time of the settlement. And those are the facts. And we, meaning the underlying plaintiff, proffered the primary theory, which was upon disclosure, the shareholders would have voted down the deal and they wanted their stock to be reverted back pre-merger. So this is not a bump-up theory. It's a bump-down theory. And the reason is, the theory is based upon the assumption that the merger never happened. Upon disclosure of the conflict of interest, there would be no merger. If there's no merger, then there's no consideration. And if there's no consideration, there's no increase in consideration. Now that report by Mr. DeBack is 16 pages long. And at the very end, he does suggest, as a reasonable check, there's also potentially this other theory, this hypothetical renegotiation. As the district court found, that theory was never quantified. It's likely not valid under Fourth Circuit law. And so the only theory that was actually quantified, and is actually potentially viable, was a bump-down theory. Why does that matter for purposes of this policy, when the policy talks about representing the amount by which such consideration is effectively increased? Effectively in representing seemed to suggest that we look at reality. What really happened? We can't go back and undo the transaction, so the shareholders got X amount after the settlement, they have now gotten Y, the X plus Y. And why aren't we just looking at that reality regardless of what an expert called it, especially in a settlement where it's a negotiation. It's not necessarily calculated based on an expert's testimony. Because, Your Honor, the adequacy of the consideration has no bearing on the settlement because it's based upon the theory that no merger took place. But in reality, they got more consideration, right? No matter what the theory was, the settlement gave them more consideration for their shares than they had previously received. I would disagree with that premise, Your Honor. They didn't get an increase in consideration. What they did was they got reverted back to what the price would have been if there's no merger. The theory that was put forth by the expert is a retroactive theory. Putting you back into the position as if the merger never happened is very different than a hypothetical renegotiation based upon intrinsic value, which the Fourth Circuit does not even recognize. So the theory unlike the cases that they cite, like Amatsu, there are two prongs to the exclusion. And the second prong says that the loss has to represent an increase in consideration. And that, the theory, the only theory that was put forth is not an increase in consideration. Moreover, An effective increase in consideration. But, Your Honor, we would submit it's not an effective increase in consideration. In fact, it's not even a viable theory under Fourth Circuit law. Second, the attorney's fees that were part of the settlement, that was not an increase in consideration to the shareholders. Anything else, Ms. Cohen? Thank you, Your Honor. Thank you very much. Ms. Tracker, you have some rebuttal time. Thank you, Your Honor. I'll just start where Ms. Cohen ended on effective consideration and just make a couple quick points. First of all, as I already explained, that theory was a measure of the difference in the stock drop. But at JA 348, you'll see the expert saying that's a way of measuring out-of-pocket loss. That difference tells you the amount they should have received. That's when they, the difference between the value of their shares and the value of the Willis shares was that amount. And that's just a way of measuring it. That's what he says. Even more importantly, counsel, plaintiff's counsel told the court what the theory was at the class certification hearing. And counsel told the court that their theory was one for having received inadequate consideration. This is in the Virginia case or the other case? This is in the Virginia case. Classification, counsel said, that's what we're complaining about. Inadequate consideration. And finally, I would make the same point that the Onyx Court and I believe Ceredine Court made, which is that the party paying is now paying the consideration, paying the amount, not paying the settlement as Willis, so it represents an effective consideration for what Willis obtained. The ownership interest and assets of, or the Willis subsidiary obtained, if you want to look at it that way, the ownership interest in the former Towers Watson, the assets of the former Towers Watson. Willis is now paying more for that as a result of the settlement. It's a classic representation of an effective increase in consideration. I also want to go back to the question Judge Agyants asked, which I don't think was correctly or really answered at all, which is why would an insurance company write an exclusion that draws this narrow, I would say artificial distinction between mergers and acquisitions? They wouldn't. There's no reason on earth an insurance company would do that. What they tried to do is what they said, which is to exclude claims asserting, claiming inadequate consideration for the acquisition of all or substantially all the ownership interest in or assets of an entity. It's the plainest possible language. There may be some disputes over what asset is, is it intellectual property, or what constitutes ownership interest in, but stepping back it could not be clearer that it encompasses this kind of transaction. It is not trying to. It's trying to escape esoteric distinctions between a merger or a takeover acquisition or a corporate acquisition. It's using acquisition exactly as a synonym for to get or obtain, to acquire these things. If we're going to have discussions about corporate law and niceties, it may be about what constitutes an ownership interest in or maybe what constitutes an asset, but acquisition is the easy part. That's just you're getting those things. And then you have to figure out in the transaction, did an entity get, obtain, acquire ownership interest in or assets of substantially all ownership interest in or assets of an entity. And that's what happened here. There's not a distinction at all as Onyx and Ceradyne and the plain language say between who the acquirer is, whether it does not apply only to assets that are ownership interest when Towers Watson acquires an entity, right? It's this case. It absolutely encompasses this case exactly as Judge Agee said when the complaint is from Towers Watson shareholders, you gave up our shares, you allowed somebody else to acquire ownership interest, i.e. our shares for an inadequate amount. When that happens, the bump up clause by its terms and by its purpose is triggered because that is a claim that creates this moral hazard where the Towers Watson management could do what it did here which is negotiate a deal for too little. Somebody complains and the management says or they negotiate a deal for too little knowing somebody probably will complain and that's fine because insurance will cover it. That's the moral hazard that applies exactly in this case. This case indeed, I think, exemplifies it. It doesn't matter, your honors, that at the end of the day there was 50.1%, 49.9% as Judge Agee pointed out. Willis shareholders ended up in the majority but that's not even the relevant inquiry. The relevant inquiry is getting at, with questions to me and to Ms. Cullen, that what you had was Towers Watson having ownership interest shares and assets. The question is did an entity acquire the ownership interest and shares? It doesn't matter, your honors, I think, whether or not it was a subsidiary of Willis and not just because for the reason Judge Agee was saying is a functional matter. The parent owns and controls the subsidiary's assets but under the plain terms of the bump up clause, a Willis subsidiary acquired substantially all of the ownership interest in and assets of Towers Watson. No matter how they were later divided, the ownership interest, the shares, it doesn't matter that they were delisted. It doesn't say shares. It doesn't say acquire the shares. It says acquire the ownership interest. Willis acquired all of the ownership interest. The Willis subsidiary did. The Willis subsidiary acquired all of the assets and that's the end of the inquiry. Thank you, your honors. Thank you very much. I appreciate the argument of counsel. I will ask the clerk to adjourn court until tomorrow morning and we'll come down and greet counsel.
judges: G. Steven Agee, Allison J. Rushing, Joseph Dawson III